UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DONNA NIXON and **MYKALA MCGUIRE-BROWN,** *individually and on behalf of all others similarly situated*,

    *Plaintiffs,*

v.

**TAN OAK FINANCIAL d/b/a TAN OAK LENDING, COHO FINANCIAL d/b/a PATH LENDING, DONALD DUNCAN,** *individually and in his official capacity as Chairperson of the Guidiville Indian Rancheria,* **NICK EISMAN, EPIC LOAN SYSTEMS, INC., DENNIS GLEN MILKS, DAVID SANCHEZ, JARED SULLIVAN, VELA SOFTWARE INTERNATIONAL INC.,** *and* **UNKNOWN ENTITIES 1-10,**

    *Defendants.*

Case Number: 8:26-cv-_____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

COMES NOW the Plaintiffs, **Donna Nixon** ("**Ms. Nixon**") and **Mykala McGuire-Brown** ("**Ms. McGuire-Brown**"), individually and on behalf of all others similarly situated, by and through their attorneys, Seraph Legal, P.A., and complain of the Defendants, **Tan Oak Financial d/b/a Tan Oak Lending** ("**Tan Oak**"), **Coho Financial d/b/a Path Lending** ("**Coho**"), **Donald Duncan**

Page **1** of **73**

("**Duncan**"), individually and in his official capacity as Chairperson of the Guidiville Indian Rancheria, **Nick Eisman** ("**Eisman**"), **Epic Loan Systems, Inc.** ("**Epic**"), **Dennis Glen Milks** ("**Milks**"), **David Sanchez** ("**Sanchez**"), **Jared Sullivan** ("**Sullivan**"), **Vela Software International Inc.** ("**Vela**"), and, at this time, **Unknown Entities 1-10** (collectively, the "**Defendants**"), stating as follows:

**PRELIMINARY STATEMENT**

1. "[I]n *The Inferno*, Dante placed usurers in the seventh circle of hell — below murderers. . . . As ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Dunn v. Global Trust Management, LLC*, 506 F. Supp. 3d 1214 (M.D. Fla. 2020) (Jung, J.) (refusing to enforce choice-of-law provision deployed in service of a rent-a-tribe scheme).

2. The cat-and-mouse game between loan sharks and state and federal regulators has driven those who seek to lend at 700% interest to migrate from rented post office boxes in small Caribbean nations to renting American Indian tribes themselves — or, more specifically, their purported sovereign immunity.

3. Unsurprisingly, the tribes willing to rent themselves out are all small, isolated, and cash-strapped. For pennies on the dollar, the tribe supplies little more than its name in an attempt to launder loans that are felonies under state law. This obfuscation is generally called a "rent-a-tribe" scheme.

Page **2** of **73**

4.      The evolution from *faux*-offshore lending to *faux*-tribal lending is evident at the very address from which Tan Oak Lending and Path Lending claimed to have operated. BestChoice123.com — a payday lending brand run by Charles Hallinan, the "Godfather of Payday Lending" — claimed, until mid-2013, to operate from Charlestown, on the Caribbean island of Nevis. After a rented Caribbean post office box became an insufficient talisman to ward off the prying eyes of state and federal regulators, BestChoice123.com then exchanged the island for the reservation, claiming to operate "Suite 6" of 621 Medicine Way on the Guidiville Indian Rancheria.

5.      As federal prosecutors would later point out, "Suite 6" was nothing more than an old cargo container parked on the Tribe's land.

6.      Hallinan pocketed roughly $3 million per month from BestChoice123.com and other purportedly Tribal brands; the Tribe's rent was approximately $20,000 a month. Hallinan was later convicted of racketeering. *United States v. Hallinan*, 290 F. Supp. 3d 355 (E.D. Pa. 2017), *aff'd sub nom. United States v. Neff*, No. 18-2282 (3d Cir. Sept. 6, 2019).

7.      BestChoice123.com was run by different operators, and its loans are long dead, but it served as a template for Path Lending, and later, Tan Oak Lending. Indeed, Path Lending and Tan Oak Lending claim to operate from the very same address as BestChoice123.com. Recent pictures of the building indicate

that the "offices" of BestChoice123.com (*i.e.*, the old metal cargo container) are still there.

8.    That others would dare attempt the same scheme that resulted in the imprisonment of Hallinan should be a surprise only to those who have never studied human behavior. As a federal court of appeals recently observed: "What do you get when you combine high-interest lending with immunity from suit? An attractive investment." *Ransom v. GreatPlains Finance, LLC*, 148 F.4th 141, (3d Cir. 2025).

9.    This is a consumer class action against the operators, principals, financiers, and essential service providers of an online loansharking enterprise which made, and collected, consumer loans to Florida residents (and residents of other states prohibiting usury) at annual interest rates exceeding 700% — more than 15 times the rate at which a loan becomes a third-degree felony under Florida law — behind the rented name of a small but federally recognized Indian tribe.

10.    Plaintiff Donna Nixon borrowed $350 from Tan Oak Lending. Over the following nine months, the enterprise extracted $2,018.51 from her checking account, nearly six times what she borrowed. She repaid the null and void loan in full, at the cost of extreme financial hardship.

11.    Plaintiff Mykala McGuire-Brown borrowed $425 under the enterprise's other brand, Path Lending, at a stated annual interest rate of 729.76%.

The enterprise debited her checking account every two weeks until her payments exceeded what it had lent her, told her she still owed $562 more, and pursued her with automated collection text messages for months afterward.

12. It is virtually axiomatic that collecting over $2,000 on a $350 loan requires the ability to electronically debit the borrower's checking account – debits timed, not coincidentally, to coincide with incoming direct deposits. The enterprise made sure it could pay itself: each loan agreement imposed a $125 penalty if a borrower did not authorize recurring electronic debits from their bank accounts. The federal Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.*, forbids conditioning credit on repayment by preauthorized electronic fund transfers; the $125 charge made exactly that condition the price of every loan.

13. Path Lending and Tan Oak Lending were not different businesses in any real sense. They were two brands of a single operation, run in parallel for years by the same Kansas City operators, using the same form contract, the same offices, the same personnel, and the same tribal veneer. When Path Lending faced a class action complaint in 2025, accusing it of being a usurious rent-a-tribe scheme, the operators settled with the named plaintiffs on an individual basis thus mooting the complaint. They then consolidated their lending through the surviving brand, Tan Oak Lending.

14.     Plaintiffs bring this action individually and on behalf of all similarly situated borrowers of both brands for violations of the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("**RICO**"), Florida's *Civil Remedies for Criminal Practices Act*, § 772.101, Fla. Stat., *et seq.* ("**CRCPA**"), the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("**FCCPA**"), and the *Electronic Fund Transfer Act*, 15 U.S.C. § 1693, *et seq.* ("**EFTA**").

## <u>JURISDICTION AND VENUE</u>

15.     Subject matter jurisdiction for Plaintiffs' federal claims arises under RICO, 18 U.S.C. § 1965, the EFTA, 15 U.S.C. § 1693m(g), and 28 U.S.C. § 1331.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under the FCCPA and CRCPA pursuant to 28 U.S.C. § 1367.

17.     This Court additionally has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, on information and belief, the proposed classes exceed 100 members, the aggregate amount in controversy exceeds $5,000,000, and at least one class member is a citizen of a state different from at least one Defendant.

18.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within this District, including in this Division.

## PARTIES

### Plaintiffs

19.    **Ms. Nixon** is a natural person residing in the City of Jacksonville, Duval County, Florida.

20.    **Ms. McGuire-Brown** is a natural person residing in the City of Tampa, Hillsborough County, Florida.

21.    Plaintiffs are each a *Consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

### Tan Oak Financial d/b/a Tan Oak Lending

22.    **Tan Oak** is an entity of presently unknown organizational form which holds itself out as "a licensed tribal lending corporation wholly owned by the Guidiville Rancheria of California," with a stated address of 621 Medicine Way, Suite 9, Ukiah, CA 95482. Tan Oak also used the name "Tan Oak Financial" in business correspondence.

23.    Tan Oak is a sister brand of Coho Financial d/b/a Path Lending. Tan Oak has originated loans since at least 2018, as alleged below. At all relevant times, Tan Oak was operated, managed, and controlled by the same Kansas City principals who operated Path Lending through Thunderbird Services, LLC, Chinook Services, LLC and/or some other parallel management and servicing entity or entities whose identities are presently unknown to Plaintiffs. When Path

Lending shut down after the litigation described below, Tan Oak continued the enterprise's lending business through at least July 2025.

### Coho Financial d/b/a Path Lending

24.    **Coho** is the entity in whose name loans were made and collected under the Path Lending brand, purportedly as a business incorporated under the laws of the Guidiville Band of Pomo Indians of the Guidiville Indian Rancheria (the "**Tribe**").

25.    Coho purported to operate under a license issued by the Tribe's lending regulatory authority. Consumer loan agreements originated by Path Lending and Tan Oak were virtually identical, and both reiterated the same claims of Tribal ownership, the same governance by the same tribal lending ordinance, both claimed a consumer's recourse was to bring a claim for relief in the "Guidiville Indian Rancheria Tribal Court." Path Lending's servicing, underwriting, collection, and management functions were performed by the same Kansas City personnel, on the same Epic loan management software platform, as Tan Oak's.

26.    On information and belief, Coho has been wound down or rendered dormant since the Path Lending class action settlement; whether Coho is a separately chartered tribal entity, a registered business name of the Tribe, or some other form is known to the Defendants.

## Duncan

27.   **Duncan** is a natural person and the Chairperson of the Tribe and previously served as Vice Chairperson and Acting Secretary. He signed, as Chairperson, the September 9, 2021 amendment to the Guidiville Indian Rancheria Tribal Lending Regulatory Ordinance, Ordinance No. 10-1 (the "**Ordinance**") — the very Tribal law, described in detail below, under which the Defendants' lending operations purport to be licensed and regulated.

28.   Duncan is named in his official capacity for purposes of prospective declaratory and injunctive relief only. See *Ex parte Young*, 209 U.S. 123 (1908). No damages are sought against the Tribe, or against Duncan in his official capacity.

29.   Duncan is also named in his personal capacity. On information and belief, Resolution #13-40 (2013) appointed Duncan to the board of directors of Upfront Processing, another rent-a-tribe operation which is still actively making loans to consumers under the name The Loansmith. The Loansmith is beneficially owned and operated by unrelated non-tribal individuals who, not coincidentally, have their main offices in the Kansas City area as well.

30.   The Defendants' own Loan Agreement and Ordinance clearly state each licensed Lender is "under the direction and control of the Tribal Council" which Duncan chairs. If those recitals are true, Duncan personally directs and supervises the lending operation; a damages claim against him in his personal

capacity is not a claim against the Tribe and implicates no sovereign immunity. *Lewis v. Clarke*, 581 U.S. 155 (2017).

31.     Duncan's board service is not limited to Upfront Processing, and the Tribe itself has publicly described a governance structure in which a handful of officials, Duncan among them, personally sit atop every tribal business.

32.     On information and belief, Duncan also holds a directorship or officer position in Stealth Armament and other tribally affiliated entities, so that the same person who executes the lending ordinance as Chairperson also presides over the Council that appoints and may remove the Authority's lone Regulatory Agent. The result is that no independent Tribal institution stands between the rented sovereign and the operation renting it: the licensing Authority, the Council that controls it, and the lender share not only the building at 621 Medicine Way but a handful of the same people. That is not the arm's-length oversight the arm-of-the-tribe doctrine presumes; it is the same control wearing two hats.

### Non-Party Operators: Thunderbird and Chinook

33.     Two Kansas City-operated entities feature throughout the facts below but are not named as defendants at this time as they are believed to have wound down. **Chinook Services, LLC** ("**Chinook**") is, on information and belief, a limited liability company chartered under the laws of the Tribe which shared its principal business address, 1321 Burlington St., Suite 200, Kansas City, MO 64116, with that

of Thunderbird Services, LLC ("**Thunderbird**"), a Delaware limited liability company. Thunderbird helped operate Path Lending and according to is own statements, was wound down in or about mid-2025, after Ms. Nixon's Loan was originated.

34.    Chinook had no employees distinct from Thunderbird's. Chinook engaged in contracts for services with non-tribal service providers, such as Clarity Servies, Inc. ("Clarity"), a credit reporting agency which caters to the deep subprime and tribal lending markets. Tradelines appearing in Clarity's credit files generally identified Path Lending as "Path Lending/Chinook Services." Chinook personnel corresponded with email addresses from the domain chinooksvcs.com and used telephone numbers with (913) area codes (Overland Park/Kansas City). Email signatures bore the logos of both Chinook Services and Tan Oak Financial.

35.    Whether Chinook itself also serviced the Tan Oak brand, or whether, consistent with the platform-segregation practice alleged herein, a parallel entity staffed by the same personnel did so, is known to the Defendants and will be confirmed in discovery. The shared signature blocks establish, at minimum, that the two brands shared a single Kansas City office.

### Eisman, Milks, Sanchez, Sullivan

36.    **Eisman** served, per his own public professional profile, as the Corporate Controller of Thunderbird from May 2015 until May 2025 — a tenure spanning the entire Path Lending operation and the first seven years of Tan Oak's.

37.    Eisman is a natural person who, on information and belief, resides at **10631 N. Holly St., Kansas City, MO 64155**.

38.    **Milks** is, or was at all times relevant, the Chief Information Officer of Thunderbird, Chinook, and possibly other related entities.

39.    Milks is a natural person who, on information and belief, resides at **7615 N. Donnelly Ave., Kansas City, MO 64158**.

40.    **Sanchez** is, or was at all times relevant, the Chief Financial Officer of Thunderbird — a title he continued to hold himself out publicly as holding, on his own professional networking profile, into at least late July 2025. Sanchez was also the Chief Financial Officer of Chinook, and possibly other related entities.

41.    Sanchez is a natural person who, on information and belief, resides at **317 NE Dartmore Ct., Lee's Summit, MO 64064**.

42.    **Sullivan** is, or was at all times relevant, the Director of Operations of Thunderbird, Chinook, and possibly other related entities.

43.    Sullivan is a natural person who, on information and belief, resides at **19509 E. Bryn Mawr Dr., Independence, MO 64057**.

44.    On information and belief, each of Eisman, Milks, Sanchez, and Sullivan simultaneously held a doppelgänger position at one or more management entities associated with the Path Lending and/or Tan Oak Lending operation, *i.e.*, each used the same title at Thunderbird as they did Chinook Services, LLC.

### Vela and Epic

45.    **Vela** is a corporation organized and existing under the laws of Ontario, Canada, with its principal business address at **360 Adelaide Street West, Suite 500, Toronto, Ontario M5V 1R7, Canada**.

46.    Vela operates under the registered business name "Aquila Software," through which it markets, licenses, and provides software to lenders in the United States, including an integrated lending technology platform known as "LendSuite," a principal product of which is the "EPIC" loan-management system — a software platform providing loan origination, underwriting, servicing, collections, and reporting tools designed for online small-dollar lending.

47.    **Epic** is Epic Loan Systems, Inc., the corporation which develops, markets, sells, and supports the EPIC platform. Epic was, by its own account, founded in 2010 by "a group of experienced lenders" to serve the online small-dollar lending market.

48.    Epic's website identifies its headquarters as **1200 SW 145th Avenue, Pembroke Pines, Florida 33027**.

49.    Vela acquired Epic on or about September 10, 2018. Epic's own materials state that it thereby "joined the Aquila Software family," Aquila being the registered business name under which Vela operates; and Vela's August 2022 announcement forming the "LendSuite Software" umbrella — headquartered in Estero, Florida — described Epic, Infinity Software, and Tekambi as "autonomous business units of Aquila."

**Unknown Entities 1-10**

50.    **Unknown Entities 1-10** include: (a) the management and servicing entities which perform, with respect to Tan Oak, the functions Thunderbird and Chinook performed with respect to Path Lending — whether affiliated with, successors to, or formally distinct from those entities; (b) persons who extended credit, likely in the form of a revolving line of credit, used as working capital to fund loans made under the Tan Oak Lending brand; (c) any "tribally chartered" management shell interposed between the Guidiville Tribe and the Kansas City operators with respect to Tan Oak; (d) the third-party debt collector(s) to whom Tan Oak accounts were referred; and, (e) the third-party payment processors through which the enterprise debited its borrowers' bank accounts. Unknown Entities also include any parent, holding, or umbrella economic-development

entity, tribal or non-tribal, through which ownership of, revenue from, or administration of the lenders was held, routed, or coordinated. Once Plaintiffs learn the true names of these entities, they will amend their complaint.

## FACTUAL ALLEGATIONS

### The Unlawful Loans

51. On or about June 18, 2025, Tan Oak made a $350, short-term, personal loan to Ms. Nixon.

52. Ms. Nixon took the loan out from her home in Florida, had the proceeds wired to her checking account which she maintains in Florida, signed all relevant documents in Florida, received loan communications in Florida, and had payment debited from her checking account at a Florida bank.

53. Tan Oak charged an annual interest rate of 727.35% for the loan, requiring Ms. Nixon to repay a total of $2,018.51 for the $350 loan.

54. Ms. Nixon repaid the loan in full.

55. On or about or about November 14, 2023, Path Lending made a $425, short-term, personal loan to Ms. McGuire-Brown.

56. Ms. McGuire-Brown took the loan out from her home in Florida, had the proceeds wired to her checking account which she maintains in Florida, signed all relevant documents in Florida, received loan communications in Florida, and had payment debited from her checking account at a Florida bank.

57.    Path Lending charged an annual interest rate of 729.76% for the loan, requiring Ms. McGuire-Brown to repay a total of $1,584.86 for the $425 loan.

58.    Ms. McGuire-Brown made at least nine payments totaling at least $594.54. Despite having repaid more than the entire $425 principal, Path Lending claimed she still owed approximately $562 more.

59.    Path Lending's debits at times overdrew Ms. McGuire-Brown's account, causing her bank to assess overdraft fees against her.

60.    Both Ms. Nixon's loan from Tan Oak and Ms. McGuire-Brown's loan from Path Lending (together, the "Loans") were used for the purchase of goods and services for personal, family, or household purposes.

61.    Thus, the Loans meet the definition of *Debt* under the FCCPA, § 559.55(6), Fla. Stat.

62.    Florida has a right to police its borders and to ensure the welfare of its residents. *Manigault v. Springs*, 199 U.S. 473, 480 (1905) ("This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.")

63.     To that end, the State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

64.     § 687.02(1), Fla. Stat., renders usurious any loan made at an interest rate greater than 18% per year.

65.     § 687.071(2), Fla. Stat., renders loans made with annual interest rates greater than 25% as criminally usurious.

66.     § 687.071(3), Fla. Stat., renders the making of a loan at an annual interest rate greater than 45% a third-degree felony.

67.     § 687.071(7), Fla. Stat., renders any criminally usurious loan void and unenforceable, and no person may collect any principal, interest, or fee thereon. *See also* § 516.02(2)(c), Fla. Stat.

68.     Long-standing Florida public policy confirms the Loan was unenforceable against Ms. Nixon. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature"); *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. 1st DCA 1988) (even recovery of principal is impermissible).

69.     The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4

So. 2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So. 2d 415 (Fla. 2d DCA 1966).

70.    Florida has taken usury one step further in the consumer loan context through the passing of the Consumer Finance Act, Chapter 516, Florida Statutes (the "**Act**").

71.    The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. § 516.02(1), Fla. Stat.

72.    The Act further restricts the interest and fees which may be charged by a licensed consumer finance company.

73.    § 516.02(2)(c), Fla. Stat., indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made.*

74.    Thus, Florida has made clear that in order to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Consumer Finance Act.

75.    Neither Tan Oak, Coho, Thunderbird, Chinook, nor any other entity related to the lending enterprise is licensed as a Consumer Finance Company in Florida.

76.    The Loans each charged annual interest rates exceeding 720%, which is more than 24 times the rate permitted by the Act and more than 29 times Florida's criminal usury rate.

77. The Loans are thus unenforceable against Ms. Nixon and Ms. McGuire-Brown, regardless of whether they were valid under tribal law or wherever else they may have been made.

78. Because the Loans were subject to annual interest rates greater than 25%, the Loans were void *ab initio* and unenforceable in Florida pursuant to § 687.071(7), Fla. Stat.

79. Because the Loans were subject to interest at more than double Florida's enforceable rate, the Loans constitute *unlawful debt* pursuant to 18 U.S.C. § 1961(6) and § 772.102(2), Fla. Stat.

80. Tan Oak and Coho, directly or through one or more of the Unknown Entities and their agents, made multiple collection communications to Ms. Nixon and Ms. McGuire-Brown, respectively, including ACH debits, e-mails, and text messages.

### $125 Penalty for Not Accepting Preauthorized Electronic Fund Transfers

81. Ms. Nixon's loan agreement states: "Origination Fee: $125 dollars for investigation related costs prior to issuing you the Loan. This fee will be waived for Borrowers agreeing to the ACH Authorizations in this Loan Agreement."

82. The identical $125 fee, contained in a contract with virtually identical language, appears in the loan agreements used by Path Lending at least as early as 2020 and likely since 2013, including on loans as small as $150. On a loan of

$150, a borrower who did not agree to preauthorized electronic withdrawal would end up receiving only $25 but still be obligated to repay nearly $600.

83.     "Investigation related costs" incurred *prior to issuing* a loan do not vary with the borrower's method of repayment. The purported fee waiver is not a bona fide cost-related discount for automatic repayment; it is a penalty imposed upon any borrower who declines to grant preauthorized electronic fund transfer authority.

84.     The ACH Authorizations which a borrower must execute to avoid the $125 charge authorize Tan Oak to debit the borrower's account for every scheduled payment, for any fees, for the *entire accelerated balance* upon any default, and to *re-initiate* any dishonored debit. Electronic payment authorization persists until the debt is "fully satisfied," and revocation is conditioned upon the borrower providing "another form of payment acceptable to us," in Tan Oak's (or Path Lending's) sole discretion.

85.     The Authorization's breadth exceeds even the private rules of the ACH network itself. The NACHA Operating Rules — the private rulebook promulgated by NACHA, the nonprofit association that governs the Automated Clearing House network and binds every financial institution and originator that sends ACH entries — permit an entry returned for insufficient or uncollected

funds to be reinitiated "no more than two times." NACHA Operating Rules § 2.12.4.

86. Tan Oak's Authorization contains no such limit. It purports to authorize the re-initiation of dishonored debits indefinitely, alongside debits for the entire accelerated balance.

87. Federal regulation says the same. Effective for covered loans as of March 30, 2025, the CFPB's Payday Lending Rule makes it "an unfair and abusive practice" for a lender to attempt to withdraw payment from a consumer's account after two consecutive attempts have failed for insufficient funds, absent a new and specific consumer authorization, and requires advance notice of first and unusual withdrawal attempts. 12 C.F.R. §§ 1041.7-1041.9.

88. Ms. Nixon's loan contains no two-attempt limitation and no Part 1041 notice apparatus; on information and belief, the Defendants' disregarded the Rule entirely.

89. No rational borrower in the market for a $350 loan at a 727% annual rate could absorb a $125 up-front charge, and for many Class members the arithmetic was starker still. The fee was a flat $125 regardless of loan size, and Path Lending as well as Tan Oak made loans of as little as $150, in which cases the "waived" fee equaled 83% of the entire amount financed. A "choice" between

granting ACH authorization and surrendering more than four-fifths of the loan proceeds is no choice at all.

90.    The fee is the same $125 whether the loan is $150 or $350, whatever the borrower's circumstances, and whatever any "investigation" might actually cost. A real fee tracks a real cost; this one tracks nothing, as it is not a fee at all.

91.    The $125 is the price of saying no: a flat penalty charged to any borrower who declines to hand the lender ACH access to her bank account. The purported choice is illusory, and the extension of credit was in fact conditioned upon repayment by preauthorized electronic fund transfers, in violation of 15 U.S.C. § 1693k(1).

92.    Congress's prohibition exists precisely for borrowers like Ms. Nixon. Where a consumer's income consists of recurring, electronic deposits, a compelled preauthorization gives the lender a standing claim on the income stream itself, reaching funds that are otherwise largely beyond the reach of even a creditor who had sued and obtained judgment.

93.    Because the $125 fee and ACH Authorization provisions appear verbatim in Tan Oak's contracts, this means every Tan Oak borrower was subjected to the same unlawful conditioning.

## The Tribe's History of Rent-A-Tribe Schemes

94.     Tan Oak purports to be a tribal lending entity owned and operated by the Tribe, which issued short-term, high-interest loans via the website tanoaklending.com.

95.     In reality, the Tribe had virtually nothing to do with the operation of the lending business and simply participated in what is often referred to as a "rent-a-tribe" scheme, in which non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

96.     While the non-tribal entities operate all or nearly all of the substantive aspects of the business — funding, marketing, loan origination, underwriting, servicing, electronic funds transfers, and collections — the tribe acts as a figurehead in exchange for a relatively insignificant portion of the revenue, often a couple pennies per dollar of net profit.

97.     Consistent with the standard architecture of such schemes, principals of the non-tribal manager are commonly appointed as signers on the tribal entity's bank accounts, assuring the non-tribal investors' control over the cash.

98.     The Guidiville Tribe is a remote, isolated Native American tribe with approximately 100 members living on a rancheria of less than 50 acres near Ukiah, California, with no significant assets such as casinos, gas, or oil.

99.    On December 13, 2010, the Tribe adopted the Ordinance and, via companion Resolution No. 10-11, established the Tribal Lending Regulatory Authority (the "**TLRA**"), the body that licenses the Tribe's lending operations.

100.    On information and belief, the Ordinance was written for the Tribe by outside attorneys representing the online payday lenders seeking to "partner" with it.

101.    The Tribe has since amended the Ordinance six times: in January 2011, March 2011, September 2013, January 2016, July 2018, and September 2021.

102.    The amendments track the launches of new lending platforms, not the development of consumer protections: the September 2013 amendment coincided with Resolution #13-40, which chartered the Loansmith operation, and the July 12, 2018 amendment came weeks after the Tan Oak website appeared online. The current version was enacted at a "special meeting" of the Tribal Council by a vote of two in favor, none opposed.

103.    The Tribe's lending ordinance does not require a person obtaining a lending license to be a member of the Tribe, nor does it require that any particular percentage of lending revenue be retained by the Tribe.

104.    The TLRA's "licenses" are, on information and belief, tribal resolutions drafted to order: in 2013, the Tribe passed Resolution #13-40 establishing Upfront Processing, which operated The Loansmith under tribal

"license" number 2013-040. When that entity re-styled itself as "Choice Capital Fund" in late 2024, it continued operating under the identical license number.

105.    On information and belief, Tan Oak's tribal "license" is likewise a resolution-numbered instrument whose adoption history will identify when, and at whose request, the Tan Oak operation was chartered.

### The Ordinance Itself Condemns the Scheme

106.    The Ordinance's sole substantive rate limitation provides that the maximum rate, "inclusive of interest and fees," may not exceed *nine hundred percent* (900%) per year. Ordinance § 6.3. That is the full measure of consumer protection the Tribe's "regulatory" regime affords.

107.    Yet, even measured on the Ordinance's own terms, Plaintiffs' loans breach even that permissive ceiling. Section 6.3 caps the rate **inclusive** of interest and fees — so the $125 "origination fee" the loan agreements impose is, by the Ordinance's own definition, part of the rate, not a charge standing outside it.

108.    A review of a $150 Path Lending loan from 2020 reveals Path Lending charging interest at an annual percentage rate of 733.46%. Once the $125 is factored in, as the Ordinance commands, the true rate climbs into the stratosphere. Without agreeing to electronic payments, a borrower would retain at most $25 in spendable funds yet would be obligated to repay $526.71, an effective interest rate of more than 3000%.

109. While the Ordinance announces a 900% ceiling, it prescribes no method for computing the annual percentage rate it purports to limit — no definition of the rate, no day-count convention, no rule for amortizing fees across a loan's term. The ceiling is therefore unenforceable on its own terms.

110. On information and belief, the Tribe has never actually computed the impact of the $125 fee to the 700%-plus interest rates already charged to see if the net effective rate exceeds 900%. Nor has the Tribe ever enforced the Ordinance or imposed any consequence on any Lender for exceeding it.

111. Path Lending appears to have been charging this $125 fee since 2013, and did so until early 2025. Tan Oak charged the $125 fee from 2018 through 2025. At no point does any publicly available Tribal record reflect the TLRA ever taking any corrective action against Tan Oak or Path Lending, despite both lenders violating the written Ordinance of the TLRA for years. Nor is there any record of it so much as auditing or reviewing the records of Tan Oak or Path Lending to ensure compliance.

112. A limit that carries no consequence if exceeded is, practically speaking, no limit at all. Like the repeated claims the lenders are "operated by the Tribe," the rate cap is simply a recital that exists to be displayed, not applied. By any ordinary computation, and per the lenders' own disclosures, the loans exceed

900% once the mandatory $125 fee is counted. The loans are thus usurious even under the only rate limit the Defendants themselves wrote.

113. That breach also exposes the "regulation" as a fiction. A genuine lending regulator reviews sample contracts its licensees use; the $125 fee and its ACH-waiver condition have appeared, unchanged, in the Lenders' standard agreements for years, in plain view of the rate cap they violate.

114. A regulator that had read a single one of its licensees' contracts against its own 900% "inclusive of interest and fees" ceiling would have caught the defect immediately. That the fee persisted across two different platforms and for over a decade establishes the TLRA reviewed nothing, or reviewed and did not care.

115. Either way, the "Tribal Lending Regulatory Authority" does not regulate the rate, the fees, the contracts, or the conduct of the businesses it licenses. That is not a failure of the regime, it is its design. A regulator that examined and enforced would, sooner or later, have to find one of these loans unlawful, and such a finding is the one thing the operation cannot survive, as the entire enterprise depends on the loans being valid where made.

116. The TLRA is therefore built to license and then turn a blind eye. It exists to issue the permissions that let the operation describe itself as regulated while never performing the review that would expose what it has licensed.

117.   The TLRA itself is, purportedly, the 11th suite at 621 Medicine Way, one door down from the lenders whose paper it does not read.

118.   The Ordinance codifies the Hallinan-era server fiction as "law": it requires the borrower to e-sign an acknowledgment that the transaction "traveled via the Internet" to Trust Lands, requires the Lender to use "a server located on Trust Lands," and "deems" every loan to take place where that server sits "regardless of the Borrower's physical location." §§ 6.2(a), (d), (e), 9.3.

119.   The September 2021 amendment added that even the server may be replaced by "secure cloud computing services," rendering the fiction even more absurd. And the fiction was false in fact: historical hosting records show that pathlending.com was never hosted from the Tribe's lands at any recorded point — its server sat near Walnut Creek, California, 130 miles away, as alleged below.

120.   Federal courts have rejected precisely this deeming device. Online lending to consumers in their home states is off-reservation conduct wherever the server sits. *Hengle*, 19 F.4th at 348-49; see also *Iipay Nation*, 898 F.3d at 968.

121.   The Ordinance's own licensure conditions condemn the actual operation. Only businesses "chartered and wholly-owned *and operated* by the Tribe" may be licensed Lenders, and a Lender "lacks the capacity to transfer management decision-making authority" to third parties. § 6.4(a), (b).

122.    Tan Oak was managed, staffed, underwritten, funded, and collected predominantly from Kansas City. Either Tan Oak's management arrangements violate the Tribe's own law, and therefore voiding its license, or the "operated by the Tribe" recital on which the entire scheme rests is false. There is no third possibility.

123.    The Ordinance likewise dictates lending revenues be "used exclusively for the benefit of the Tribe." §§ 1.2(c), 1.3(a)-(b).

124.    In practice, on information and belief, 98 to 99 cents of every dollar of net profit flowed to non-tribal persons. The operation violates the foundational policy of the very ordinance under which it claims legitimacy.

125.    The "Authority" the Ordinance establishes is, by design, a single "Regulatory Agent" appointed by the Tribal Council, whose minimum qualifications are that he or she be 21 years of age and hold a high school diploma. § 4.7. This one person constitutes the entire "regulatory" apparatus that purportedly supervises multiple lending brands transacting tens of millions of dollars and whose license documents are, as alleged above, drafted and corrected by the Kansas City operators themselves.

126.    On information and belief, the Regulatory Agent during at least part of the relevant period was Kevin Cline who, as detailed below, appeared at the January 2020 Florida marketing conference hosted by Epic, the Defendants' own

loan-management software vendor, as an industry compliance panelist. Cline was identified in the conference program as "Regulatory Agent, Guidiville Indian Rancheria."

127.   The Ordinance requires that "Financial Backers" (the persons funding the loans) and "Vendors" (the persons providing specialized services to the lending operation) be licensed by the TLRA, upon applications disclosing their financial condition, the qualifications and business history of their officers, directors, and members, prior judgments against them, and their tax identification numbers, with annual reports identifying all key employees, all retained for at least six years. §§ 2.1(d), (o), 5.1(b), 5.4.

128.   The identities of the Unknown Entities (*e.g.*, the funders, the management umbrella, etc.) are therefore recorded in license files that the Defendants' own law requires to exist and to be preserved.

129.   Notably absent from this licensing apparatus is any economic floor. The Ordinance nowhere requires that any minimum share of lending revenue be distributed to, or retained by, the Tribe. The regime meticulously licenses the non-tribal persons who fund and service the loans while guaranteeing the Tribe no particular part of what they take.

130.   The Ordinance names the EFTA by title, citation, and regulation, among the federal laws whose "principles" Lenders must observe, while

purporting to disclaim "the application of any enforcement mechanisms or protections described in those laws as against the Lender." § 6.6.

131. The Defendants thus memorialized their knowledge of the precise statute sued upon here, and attempted, in the same sentence, to repeal its remedies. A contractual or quasi-legislative renunciation of federal statutory remedies is an unenforceable prospective waiver. *See Hengle*, 19 F.4th at 334-39; *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673-76 (4th Cir. 2016).

132. The provision also cites Regulation E at "12 C.F.R. Part 205" — a citation obsolete since 2011 — and is another fossil marking the Ordinance's origin in pre-2011 industry templates.

133. Finally, the Ordinance retaliates against this very lawsuit. It provides that if any borrower "seeks a class-action lawsuit" in "any other venue," the filing "shall have the automatic and immediate effect of voiding all recourse provided by this Ordinance and voiding any and all limited waivers of sovereign immunity." § 10.3.

134. The Tribe's "remedial scheme" is thus designed not to remedy but to punish, a structure that is itself an unenforceable prospective waiver and that confirms no adequate alternative forum exists.

135. Ms. Nixon's Loan Agreement cannot even consistently identify the Tribal law that purportedly governs it. The first page of her agreement invokes a

"Tribal Lending Regulatory Ordinance," its arbitration provision invokes a "Tribal Financial Services Regulatory Ordinance," and its dispute-resolution provision refers to "the Tribal Financial Code."

136.   The Loan Agreement requires the borrower to "consent to the sole subject matter and personal jurisdiction of the Guidiville Indian Rancheria Tribal Court." On information and belief, no such standing court exists. The Tribe's judicial forum is the Intertribal Court of Southern California, a consortium circuit court headquartered in Valley Center, San Diego County, California, roughly 500 miles from the Tribe's rancheria, which is not mentioned anywhere in the Loan Agreement.

137.   Indeed, the Ordinance itself speaks of tribal court membership in the future tense: "The Tribe *shall become* a member of a recognized intertribal court system such as Intertribal Court of Southern California or Northwest Intertribal Court System." § 10.1(d)(1) (as amended Sept. 9, 2021). As of the Ordinance's most recent amendment, the "Tribal Court" to which Ms. Nixon's 2025 contract consigns all disputes did not yet functionally exist.

138.   As aforementioned, the TLRA is located in Suite 11 of 621 Medicine Way, the same small building whose other suites supposedly house every lending brand the TLRA purports to regulate.

139.    Ostensibly, 621 Medicine Way houses, or housed: Coho Financial d/b/a Path Lending (Suite 1); The Loansmith (Suite 2), an online lender charging interest rates exceeding 700% which is operated by different non-tribal persons; Elevation Loans (Suite 4); BestChoice123.com (Suite 6), one of the Hallinan-era brands; Tan Oak Lending (Suite 9); and the TLRA (Suite 11).

140.    The Tribe thus claims that a half-dozen lending businesses — which collectively made tens of thousands of loans per month and transacted tens of millions of dollars in revenue — operate from offices totaling approximately 1,200 square feet, excluding the cargo container which served as Hallinan's "Suite 6."

141.    The brands at 621 Medicine Way trace to different off-reservation operators. Public domain-registration records for elevationloans.com, the "Elevation Loans" of Suite 4, listed the domain's registrant organization in early 2021 as "KwikCash," a non-tribal California lending operation; by December 2021, the same field had been shortened to the bare initials "KC."

142.    The Tribe, in short, is not the operator of these businesses; it is their common landlord — and the tenants' identifying details have a way of shrinking from the public record over time.

143.    A Google Street View image of 621 Medicine Way shows the purported headquarters of this multi-lender financial ecosystem — a small modular building — with the Hallinan-era cargo container still standing beside it:



144.   The Tribe's history of renting its sovereign immunity to non-tribal payday lenders is a matter of public record and has resulted in federal criminal convictions.

145.   The Tribe's initial rent-a-tribe arrangement was with Hallinan, a Pennsylvania businessman and the purported "Godfather of Payday Lending," and concerned Hamilton Liberty, Tribal Consumer Lending, and BestChoice123.com.

146.   Federal prosecutors alleged Hallinan's businesses took in approximately $3 million per month, with the Tribe's cut being approximately $20,000 per month. The notion that loans were approved on the Tribe's land rested on a $200 computer shipped to Ukiah and placed in an empty cargo container on the Tribe's land — a computer containing no hardware or software capable of approving loans, and which the Tribe later learned was not even connected to the internet.

147. When the Tribe developed misgivings and adopted a 36% interest rate cap on loans made in its name, Hallinan's attorney, Wheeler Neff, told the Tribe the cap was a "deal killer" that would cause Hallinan to move his business to a more usury-friendly tribe. The cap did not survive.

148. As the United States alleged, "the only role of the Tribe … was to give the appearance that it owned and operated the payday lending organization and assert 'sovereign immunity' if anyone complained that the loans violated state laws." *United States v. Hallinan*, 290 F. Supp. 3d 355 (E.D. Pa. 2017). Hallinan was convicted of racketeering and related offenses in 2017, sentenced to a 14-year federal prison term, and ordered to forfeit $64 million. *See also United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (affirming convictions; "reasonable people would know that collecting unlawful debt is unlawful").

149. Plaintiffs obtained their Loans from their homes in Florida, received the proceeds in their Florida bank accounts, signed all documents in Florida, and had payments debited from their Florida bank accounts.

150. Further, all of the necessary acts – as well as the final one – to create what Tan Oak and Path Lending purported to be binding contracts occurred in Florida.

151.    "Federal courts applying Florida law have held that under *lex loci contractus,* clicking accept is the last act needed" to confirm similar contracts. *Garn* at *2 (S.D. Fla. Mar. 26, 2025).

152.    A consumer's location when transacting through an online portal with a tribal entity determines where the transaction occurs. *See California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018); *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014).

153.    Thus, Plaintiffs' Loans occurred in Florida and are governed by Florida law.

### Neither Tan Oak nor Coho Is an Arm of the Tribe, and a Judgment Against Either Would Not Touch the Tribe's Treasury

154.    The lenders' own contracts claim each lender is "a commercial entity formed pursuant to federal and tribal laws," a "for-profit commercial entity of the Guidiville Band" formed "for the express purpose of economic development" while simultaneously asserting that both the lender and the Tribe "are immune from suit in any court" absent an express written waiver by the Tribal Council.

155.    That assertion of immunity is wrong. Sovereign immunity is personal to the sovereign and extends only to entities that are truly the sovereign's arms. *Galette v. New Jersey Transit Corp.*, 146 S. Ct. 854 (2026).

156.    In *Galette*, a unanimous Supreme Court held that a separately incorporated entity — one that holds its own property, enters its own contracts,

and pays its own debts — cannot claim sovereign immunity merely because the sovereign created it, controls it, or funds it. Sovereign immunity belongs to the sovereign itself, not to every entity the sovereign creates, and the analysis turns on the entity's separate legal existence and whether the sovereign would be answerable for the entity's obligations.

157. The same arm-of-the-sovereign analysis governs assertions of tribal sovereign immunity by purportedly tribal commercial entities, and the entity claiming immunity bears the burden of establishing it. *See Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019); *White v. Univ. of Cal.*, 765 F.3d 1010 (9th Cir. 2014); *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010).

158. Most fundamentally, a judgment against Tan Oak or Coho would not be paid from the Tribe's treasury. Each lender holds its own property (its loan receivables), entered its own contracts (including the Loan Agreements at issue), and pays its own debts. Each was capitalized by revolving credit lines issued by non-Tribal persons. On information and belief, neither chartering documents nor tribal law renders the Tribe legally responsible for either lender's obligations.

159. The Tribe's own Ordinance says so expressly. Even where a lender's immunity is waived, this does not "consent to the levy of any judgment, lien or attachment upon property of the Lender other than property specifically pledged

or assigned." § 6.5(d)(4). The Tribal Court may in no event "expand recourse beyond the assets of the Lender." § 10.1(d)(4). And no indebtedness of the TLRA "shall implicate or in any way involve any assets of tribal members or the Tribe" not assigned to it in writing. § 4.6.

160. By the Tribe's own legislation, then, recourse respecting a licensed lender begins and ends with the lender's own assets. The Tribe has disclaimed any legal responsibility for the lender's obligations.

161. Plaintiffs do not name the Tribe as a defendant, do not challenge the Tribe's sovereignty, and seek no relief against the Tribe, its governmental revenues, or its lands. A money judgment here would be satisfied from the assets of the commercial entity and of the non-tribal operators who took the 98% share of profits — precisely the configuration in which *Galette* holds sovereign immunity unavailable.

162. The Third Circuit reached the same conclusion as to a tribally chartered payday lender just months before *Galette*. Where the entity could not show that a judgment against it would impact the tribe's finances and a non-tribal investor's funding constrained the tribe's control, the lender was not an arm of the tribe and had no sovereign immunity. *Ransom v. GreatPlains Finance, LLC*, 148 F.4th 141 (3d Cir. 2025). Tan Oak's configuration is more extreme, as its funding, control, staffing, and the overwhelming share of profits are all non-tribal.

**The Same Kansas City Principals Operate Both Path Lending and Tan Oak**

163.    The domain PathLending.com was registered on April 8, 2012. Archived domain name registration records show it was registered to Dennis Milks of Paycrom Holdings, Ltd., a shell company purportedly based in the Isle of Man.

164.    Historical IP records maintained by DomainTools show that pathlending.com was hosted at IP address 75.8.211.19, a physical location near Walnut Creek, California, more than 130 miles from the Tribe's reservation.

165.    Previously, Milks was a senior technology advisor at Evergreen Capital Partners, one of the businesses run by Scott Tucker of Kansas City, whose companies made loans to over 4.5 million Americans at interest rates typically exceeding 700% annually, and collected over $3.5 billion in revenue through numerous rent-a-tribe schemes. In October 2017, Tucker was criminally convicted under RICO and sentenced to 16 years and 8 months in a federal prison.

166.    Milks later incorporated Thunderbird, a Delaware limited liability company formed in or around 2013, in the same period in which the Hallinan-era arrangement was winding down.

167.    Thunderbird has publicly described itself, at different times, in two revealing ways, as providing "consulting services to Native American Indian Tribes in the areas of Accounting, Information Technology, Operations

Management and Federal Consumer Lending Compliance," and as a company that "provided underwriting software and business intelligence solutions to small financial service businesses from 2013 until 2025." Both descriptions describe the same work: running the underwriting, technology, accounting, and compliance functions of the lending brands.

168.   Thunderbird beneficially operated Path Lending through the nominally Tribal entities Coho Financial and Chinook Services.

169.   Every management position at Chinook Services was staffed by an employee of Thunderbird holding the identical position at Thunderbird. Chinook used the same Kansas City address as Thunderbird. The domain cohofinancial.com was registered by Milks on August 29, 2016, and the only persons using @cohofinancial.com email addresses were Thunderbird personnel.

170.   On information and belief, and consistent with the practice of operators running multiple tribal lending programs, the Kansas City principals segregated each lending brand into a separately formed management entity so that a judgment against the manager of one brand would not reach the operations or assets of another. Thunderbird and Chinook performed the management and servicing functions for Path Lending; on information and belief, one or more parallel entities — formed, controlled, and staffed by the same principals — performed those functions for Tan Oak.

171.    On information and belief, Thunderbird itself was wound down in or about mid-2025 — months after the Path Lending settlement, and after Ms. Nixon's loan was originated. Its IT Development Project Manager remained a full-time Thunderbird employee until July 2025, per her own public professional profile, and its Chief Financial Officer continued to identify himself publicly as Thunderbird's CFO after the Ms. Nixon's loan origination. Thunderbird's own company page now confirms the operating window in the past tense, describing a company that operated "from 2013 until 2025."

172.    In the fall of 2024, many Path Lending borrowers received automated text messages soliciting discounted payoffs of their null and void loans. Ms. McGuire-Brown received the identical message twice — on September 20, 2024, and again on October 24, 2024, each delivered at precisely 11:05 a.m. — from SMS short code 63591: "Path Lending: SETTLE your Account with this SPECIAL Offer! Reply or Call (800-581-6916) to activate the savings. To optout reply STOP."

173.    Each text message asserted, and solicited payment upon, a purported legal right to collect a loan that was void where Ms. McGuire-Brown lived. Each was generated by an automated campaign — the same text, delivered at the same minute of the day, weeks apart — establishing that the enterprise's collection conduct was uniform and mechanized, not individualized.

174. On January 28, 2025, a class action was filed against Coho Financial d/b/a Path Lending, alleging that Path Lending was a front for a non-tribal payday lender using the Guidiville Tribe to circumvent state usury laws, asserting claims under state usury law and RICO and seeking damages and declaratory relief against the scheme's co-conspirators. The named plaintiff there had obtained five Path Lending loans at annual percentage rates of 675.27%, 793.08%, 790.79%, 906.97%, and 813.86%, illustrating both the uniformity of the enterprise's triple-digit pricing and its practice of serially re-lending to the same small-dollar borrowers.

175. The Tribe-side administration of the lending platforms is itself centralized in non-tribal hands. Michael Derry, who is not, on information and belief, a member of the Tribe, serves as CEO of the Tribe's economic development corporation, has identified himself as General Manager of The Loansmith, and has identified himself as authorized to enter contracts on behalf of Chinook Services. Derry testified at Hallinan's criminal trial that he and the Tribe had cooperated with Hallinan to facilitate millions of dollars of triple-digit-interest loans.

176. The Tribe's own public materials confirm the pattern: the board-of-directors page of Stealth Armament, another tribal venture, described the then-Tribal Chairperson as chairing the boards of "all of the Tribe's economic development entities that are Arms of the Tribe," a single tribal officer as Treasurer

"for all the Tribe's economic development entities," Duncan as Board Secretary, and Derry as the "Division Chief" coordinating the ventures' business divisions. On the tribal side, every venture — from firearms to solar to lending — is governed by the same interlocked handful of names, while the operations themselves run elsewhere.

177. Shortly after the 2025 class action settlement, Path Lending ceased operations. Its domain, pathlending.com, was abandoned and is presently offered to the public for sale.

178. The Tan Oak Lending brand did not, however, appear after Path's collapse. It had operated in parallel since approximately March 2018, from Suite 9 of the same address, reporting a single employee.

179. Tan Oak originated loans continuously from at least 2018 through approximately mid-2025 or later.

180. By 2025, Tan Oak no longer took applications through its own website. Its FAQ told borrowers that "we most likely purchased your loan application from a third party," after which the consumer was "re-directed" to Tan Oak's site to sign the loan agreement.

181. Tan Oak's customers, in other words, did not seek out a "tribal" lender. They applied for loans on generic lead-generation websites, their applications were auctioned to whichever lender bought them, and the "consent

Page **43** of **73**

to tribal jurisdiction" recited in the resulting loan agreements was extracted from consumers who never chose, and in most cases had never heard of, the Guidiville Tribe before being redirected to a signature page.

182. On information and belief, Tan Oak ceased originating new loans on or about mid-2025. The final posted Better Business Bureau complaint, filed March 14, 2025, went unanswered, unlike every prior complaint, each of which received a prompt formal response, and no complaints have been filed since. Tan Oak nonetheless continued to collect outstanding loans, including Ms. Nixon's, whose payment schedule ran through April 3, 2026, and continued to maintain its website, posting an updated tribal "Business License" in August 2025.

183. That "Business License" is a one-page certificate issued by the TLRA, captioned "Business License #2018-051," reciting that it is issued "[p]ursuant to the Guidiville Indian Rancheria Tribal Lending Regulatory Ordinance (#10-1) as amended." It identifies the licensee as "Tan Oak Financial" and lists a business address of 621 Medicine Way #9, Ukiah, California.

184. The Path Lending and Tan Oak form loan agreements are essentially the same document. A 2020 Path Lending contract and a 2025 Tan Oak contract contain the identical $125 origination fee provision, the identical late fee, NSF fee, ACH Authorization provisions, and the identical typographical errors, including "waved" for "waived," "contracting us" for "contacting us," and an unclosed

parenthesis at item "(g" of the Additional Acknowledgements. These shared errors are drafter-specific and are materially different from the contract used by The Loansmith which contains none of these drafting errors.

185.   Both Path Lending and Tan Oak contracts require that the borrower's web browser support "Netscape 4.7+" — a web browser launched in 1993 and discontinued in 2008, more than a decade before Ms. Nixon's loan. A contract drafted in 2025 would almost certainly not mention Netscape. A contract *copied*, generation after generation, from a form first drafted in the early 2000s, absolutely would.

### Vela and Epic's Role in the Enterprise

186.   Vela and Epic, through the EPIC platform, provided the technological infrastructure essential to the Path Lending and Tan Oak enterprise – loan origination, underwriting, decisioning, servicing, account management, and collection communications, including multiple collection text messages transmitted to Ms. McGuire-Brown.

187.   Vela's ownership spans the entire Tan Oak operation. Vela acquired Epic on or about September 10, 2018 and has owned the platform throughout every Tan Oak loan ever originated. As of 2026, the LendSuite product page for EPIC advertises the platform to lenders "managing tribal lending."

188. Epic was listed as an "authorized user" of the "Tan Oak Lending" subscriber account maintained with Clarity by the Kansas City operators, and consumer report inquiries made from that subscriber account bore Epic's name as well as Tan Oak's.

189. Epic's role is documented in Ms. Nixon's own records: her Clarity consumer disclosure reflects a September 7, 2023 "Credit Application — Online Installment Loan" inquiry made by "Tan Oak Lending / Epic" — the joint subscriber identity through which Epic performed underwriting and decisioning for Tan Oak applicants, including Ms. Nixon.

190. Epic specifically caters to the "tribal" lending industry, touting "15+ Years in Small-Dollar & Tribal Lending," offering to "configure lending models, repayment terms, risk tools, and audit workflows tailored to tribal needs," and sponsoring and presenting at trade gatherings devoted to online lending, including LendConnect 2020, the 2022 Tribal Lending Summit, and the 2024 OLA Tribal Summit which Epic's affiliate LendSuite Software sponsored and at which Epic was, in its own words, "proud to be represented."

191. The January 2020 gathering deserves particular attention, because Epic did not merely attend, it hosted. "LendConnect 2020," held at the Margaritaville Hollywood Beach Resort in Hollywood, Florida, was Epic's own user conference, and Epic's own program shows what its user base convened to

learn: a dedicated tribal-lending track sponsored by the Native American Financial Services Association, with panels titled "The Tribal Lending Eco-System," "Tribal Lending: Impacting a Community," and "Tribal Lending Best Practices: Remaining Compliant;" a breakout session on "The Importance of ACH within EPIC;" and a compliance seminar titled, "How to Create Meaningful Work in a 'Dirty' Industry."

192.  Seated on the "Remaining Compliant" panel at Epic's conference, alongside executives of tribal lending entities then defending the industry's largest rent-a-tribe lawsuits, was Kevin Cline, identified in Epic's program as "Regulatory Agent, Guidiville Indian Rancheria." The Tribe's entire regulatory apparatus — the one-person Authority described above — traveled to the software vendor's beachfront marketing conference and appeared as an industry panelist. A "regulator" whose licensees' paperwork is drafted in Kansas City, and who networks at the platform vendor's user conference, is not an arm's-length supervisor of the industry, he is a participant in it. And his appearance documents that the Guidiville lending program and Epic were nodes of a single commercial ecosystem no later than January 2020 — more than five years before Ms. Nixon's Loan was underwritten and serviced on Epic's platform.

193.  Most pertinent to the payment machinery at the heart of this case, the roster included ACH processors marketing their Epic integrations by name: Usio,

Inc., a NACHA-certified third-party sender advertising itself as "EPIC Integrated"; Viking Payment Service, advertising "Integration with EPIC;" LoanPaymentPro, advertising payment processing for "ALL types of lenders, including Tribal," available "through an easy API integration into the leading Loan Management Software providers, led by Epic Loan Systems"; and Transcend Pay, advertising ACH and remotely created check processing for "Tribal" lenders. On information and belief, the Unknown Entity payment processor(s) which executed the Class's debits are among the processors integrated with the Epic platform.

194. Epic's facilitation was not limited to the front end of the loan. The automated settlement-offer text messages sent to Path Lending borrowers in the fall of 2024 were transmitted from SMS short code 63591, a dedicated short code attributed to "Epic Software," under the campaign name "Epic," registered in March 2017.

195. The code identifies itself. A "HELP" inquiry texted to 63591 on December 23, 2024 returned an automated reply beginning "Epic Software: For cust svc call 800-979-1212."

196. Epic's entanglement with the rent-a-tribe model is industry-wide. On information and belief, Epic's software powered many of the forty-plus lending brands operated under LDF Holdings, LLC — the tribal licensing constellation

which, together with its non-tribal operators, settled rent-a-tribe class claims in 2023 for $37 million in cash and the discharge of nearly $1 billion in outstanding loan balances.

197. Vela's sister business unit, Lead Envy Inc. d/b/a Tekambi — acquired by Aquila in March 2022 — markets lead-management, decisioning, and "collections and debt management" services to the same market, counting among its clients tribal lenders such as Plain Green, LLC, of which a federal court observed: "Plain Green is a payday lending entity cleverly designed to enable Defendants to skirt federal and state consumer protection laws under the cloak of tribal immunity."

198. Epic's public marketing leaves no ambiguity about what its software is for. Epic's own website advertises "Tribal Lending Software" as a distinct product line, alongside "Payday/Flexpay Loan Software" and "Texas CSO/CAB Loan Software." It promises that "[f]rom online loans to tribal and Texas CSO/CAB lending, EPIC powers every stage of your loan lifecycle." Epic does not sell general-purpose lending software which tribal lenders happen to use; it builds, markets, and sells software specifically built for the tribal lending model, with its product lines organized by the regulatory regime to be navigated.

199. With respect to Ms. Nixon's Loan, Epic knew: (a) she was a Florida resident; (b) the interest rate exceeded 700%; and, (c) the Loan was funded and

operated by the Kansas City operators and their non-tribal entities, not by an actual tribal entity. With this knowledge, Vela and Epic provided services to the Tan Oak enterprise and were compensated for them.

### The Defendants' Enterprise

200.    RICO defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Boyle v. United States*, 556 U.S. 938, 944 (2009); *United States v. Turkette*, 452 U.S. 576, 583 (1981).

201.    Tan Oak, Coho, Milks, Sanchez, Sullivan, Eisman, Duncan, Vela, Epic, and the Unknown Entities, together with other participants in the scheme, including Thunderbird, Chinook, the Tribe, the TLRA, lead generators, payment processors, SMS providers, and specialty consumer reporting agencies, are an association-in-fact enterprise (the "**Tan Oak Enterprise**"), associated together for the common purpose of making, collecting, and profiting from loans which are unlawful debts, in some cases directly and in others indirectly.

### The Role of Each Individual Defendant in the Conduct of the Enterprise

202.    Liability under § 1962(c) attaches to those who participate in the operation or management of the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993). Each individual Defendant did so personally, as follows.

(The roles of Tan Oak, Vela, Epic, Duncan, and the Unknown Entities are detailed elsewhere in this Complaint.)

203. **Milks** built and controls the enterprise's corporate and technological skeleton. He personally registered pathlending.com (April 8, 2012, through an Isle of Man shell, six days after the FTC sued the Tucker organization) and cohofinancial.com (August 29, 2016, in his own name through "Milks Resources" of Liberty, Missouri — the domain's historical WHOIS record lists Dennis Milks personally as the registrant, administrative, and technical contact); he incorporated Thunderbird in Delaware in or around 2013; as Chief Information Officer, he certified, on information and belief, the lending brands' consumer-reporting subscriber relationships and controls the configuration and location of the scheme's computer systems; and in January 2025, he personally participated, from a Thunderbird email address, in the recredentialing of the Path and Tan Oak consumer-reporting accounts described above.

204. **Sanchez** is the enterprise's money manager. As Chief Financial Officer of Thunderbird — and, simultaneously and identically, of Chinook, and on information and belief, of the parallel Tan Oak management entity — Sanchez directed the financial operations that are the enterprise's entire object: the funding of loan disbursements from non-tribal capital; the receipt of ACH collections, including the $2,018.51 collected from Ms. Nixon; the servicing of the enterprise's

financiers; and the distributions under which, on information and belief, ninety-eight to ninety-nine cents of every dollar of net profit left the Tribe. On information and belief, he was a designated financial contact on the lending brands' consumer-reporting subscriber files.

205.    **Sullivan** ran operations and personally maintained the scheme's licensing and reporting apparatus. He served as Director of Operations of Thunderbird and, identically, of Chinook; on information and belief, he was the designated operations contact and the designated reinvestigation contact for the lending brands' consumer-reporting relationships, meaning consumer disputes under the Fair Credit Reporting Act concerning the void loans' tradelines were routed to Sullivan personally, in Kansas City. And when Clarity flagged a defect in the tribal lending license during the January 2025 recredentialing cycle described above, it was Sullivan who personally took the license back and had it corrected — hands-on maintenance, from Kansas City, of the very documents on which the scheme's claim to tribal legitimacy rests.

206.    **Eisman** kept the enterprise's books. As Controller of Thunderbird — and, simultaneously and identically, of Chinook, and on information and belief of the parallel Tan Oak management entity — he maintained the accounting records of the lending operations: he booked the collections of unlawful debt, computed and recorded the fee extractions and distributions that moved the profits to non-

tribal persons, and, on information and belief, prepared the financial submissions the Ordinance requires of licensees and their backers. Eisman's own public professional profile confirms the role in his words: he describes leading Thunderbird's treasury management (cash flow, liquidity, and "payment processing") and preparing monthly and quarterly reports for "board level review" for a "multi-million dollar corporation." The board which received those reports, and the reports themselves, are discovery targets.

207.    Each of Milks, Sanchez, Sullivan, and Eisman received salaries, distributions, and other compensation derived directly from the collection of unlawful debts, including the debts collected from Plaintiffs. Each continued to perform the same role, for the same Kansas City operation, through the successive Path Lending and Tan Oak brands, continuity that is itself evidence of each Defendant's knowing agreement to the conduct of the enterprise.

208.    Eisman, as Controller, and Sanchez, as Chief Financial Officer, were keenly aware of the revenue the enterprise generated and how little of it remained with the Tribe.

209.    Duncan, as Chairperson, has administered and authorized the licensing scheme through which the enterprise operates, and, on information and belief, receives compensation derived from the collection of unlawful debts.

210. The Tan Oak Enterprise made and collected unlawful loans to Florida consumers from at least 2018 and continued collecting them into 2026; its predecessor and sister operation, Path Lending, did the same from approximately 2013 until 2025.

211. Ms. Nixon repaid her void loan in full. She has been damaged in the amount of every dollar she paid — $2,018.51, including $1,668.51 in finance charges, nearly five times the principal — on a loan that was void and criminally usurious under Florida law.

212. The enterprise's debits left Ms. Nixon short on essentials and on her legitimate obligations, producing a cascade of shortfalls, late fees, and charges imposed by her legitimate creditors, and the loss of use of funds she could not spare.

213. Ms. Nixon also suffered emotional distress, anxiety, and frustration as a result of the Defendants' collection of a debt she did not lawfully owe.

214. Ms. McGuire-Brown was likewise damaged. She paid at least $594.54 on a loan void from its inception. The enterprise's debits caused her bank to assess overdraft fees against her, and when the operators abandoned the Path Lending brand, they still asserted and attempted to collect a purported $562 balance from her.

215. Ms. McGuire-Brown also suffered emotional distress, anxiety, and frustration as a result of the Defendants' collection of, and persistent attempts to collect, a debt she did not lawfully owe.

216. Plaintiffs have hired the aforementioned law firm to represent them in this matter and have assigned their right to fees and costs to such firm.

## CLASS ACTION ALLEGATIONS

217. Plaintiffs bring this action individually and on behalf of the following Classes pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) — Ms. Nixon as to each Class, and Ms. McGuire-Brown as to the Florida Usury Class, the Nationwide Usury Class, and the FCCPA Class:

218. The "**Florida Usury Class**": All natural persons residing in Florida who entered into a loan agreement bearing an annual interest rate exceeding 45% under the Tan Oak Lending or Path Lending brand names and who paid any amount of principal, interest, or fees thereon within five (5) years preceding the filing of this Complaint.

219. The "**Nationwide Usury Class**[1]": All natural persons residing in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky,

---

[1] Plaintiffs reserve the right to amend the definition of the Classes based on subsequent discovery or legal developments.

Page **55** of 73

Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin, or Wyoming who entered into a loan agreement under the Tan Oak Lending or Path Lending brand names bearing an annual interest rate exceeding twice the rate enforceable under the usury laws of their respective states of residence,[2] and who paid any amount of principal, interest, or fees thereon within four (4) years preceding the filing of this Complaint.

220.    The "**FCCPA Class**": All natural persons residing in Florida who received collection correspondence from any Defendant regarding a Tan Oak Lending or Path Lending loan within two years preceding the filing of this Complaint.

---

[2] See Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ark. Const. Art. XIX § 13; Ariz. Rev. Stat. Ann. §§ 44-1201-1204; Cal. Const. art. XV § 1; Cal. Civ. Code §§ 1916-1, 1916-2, 1916-3; Colo. Rev. Stat. Ann. §§ 5-12-101, 5-12-103, 5-2-201; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.04, 687.071; O.C.G.A. §§ 7-3-3, 7-3-4, 7-3-11, 7-3-50(a), 16-17-1, 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; Ind. Code § 24-4.5-201; Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, et seq.; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.J. Code §§ 31:1-1, 31:1-3; N.H. Rev. Stat. § 399-A:23; N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. §§ 1343.01, 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.D. Code § 54-3-1.1, et seq.; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

221. The "**EFTA Class**": All natural persons in the United States who obtained a loan from Tan Oak Lending which was conditioned upon repayment by preauthorized electronic fund transfers, and whose loans were originated, or whose accounts were debited, within one year preceding the filing of this Complaint.

222. Excluded from each Class are the Defendants; any parent, subsidiary, affiliate, officer, director, member, or employee of any Defendant; the Tribe and its officials; any judicial officer presiding over this action and members of their immediate families and staff; and Plaintiffs' counsel.

223. **Numerosity. Fed R. Civ. P. 23(a)(1).** The members of each Class are so numerous that joinder of all members is impracticable. On information and belief, the enterprise originated thousands of loans per year across the Path Lending and Tan Oak Lending brands through purchased leads. The precise number and identities of Class members are ascertainable from the Defendants' own records, including the EPIC loan-management database and Clarity's subscriber inquiry and tradeline records.

224. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact predominate, because every Class member's loan was made on the identical form contract, at interest rates exceeding 45% per annum, subject to the identical $125 origination

fee and ACH Authorization provisions, and was originated, serviced, and collected through the identical enterprise. Common questions include, *inter alia*: whether the loans are void under § 687.071(7), Fla. Stat.; whether the loans constitute unlawful debts under 18 U.S.C. § 1961(6) and § 772.102(2), Fla. Stat.; whether the Defendants associated as an enterprise and collected unlawful debts; whether the Defendants participated in the enterprise through the collection of unlawful debt; whether Tan Oak Lending is an arm of the Tribe or a non-tribal business in tribal costume; whether the $125 fee structure conditioned credit on preauthorized electronic fund transfers in violation of 15 U.S.C. § 1693k(1); whether the Loans charged interest exceeding twice the rate enforceable under the usury laws of each Class member's state of residence; whether the Defendants' collection of the loans violated § 559.72(9), Fla. Stat.; and, whether Plaintiffs and the members of the Classes were harmed by the Defendants.

225. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of those of the Classes: each Plaintiff's loan was made on the enterprise's common form contract, at a rate exceeding 700%, subject to the same fee and ACH provisions, and collected through the same enterprise — Ms. Nixon under the Tan Oak Lending brand, Ms. McGuire-Brown under the Path Lending brand. The enterprise made materially identical loans, on the same form contract and at the same triple-digit interest rates, to consumers throughout the United States;

Plaintiffs' claims arise from that uniform conduct and rest on the same legal theories as the claims of the out-of-state members of the Nationwide Usury Class, each of whose loan likewise carried an interest rate exceeding twice the rate enforceable under the usury laws of the member's state of residence and thus constituted an unlawful debt under RICO. Plaintiffs have no interest adverse or antagonistic to the interests of other members of the Classes and have the same claims for statutory damages that they seek for members of the Classes.

226. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Classes. Their interests do not conflict with those of the Class members, and they have retained counsel experienced in consumer protection class litigation, including litigation against this very enterprise.

227. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Common questions predominate over any individual questions, and a class action is superior to other available methods of adjudication. The individual claims are negative-value claims — no rational borrower of $350 can litigate a RICO action against a multi-state enterprise — and the uniform form contract makes classwide resolution efficient and manageable. Superiority is confirmed by the Defendants' own Ordinance, which purports to void every remedy it provides, along with every waiver of immunity, the moment any borrower seeks class relief in any

venue. The purported alternative forum is engineered to make aggregate redress impossible. Even if the members of the Classes themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

228. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** The Defendants have acted on grounds that apply generally to the Classes, such that final injunctive and declaratory relief, including a declaration that the loans are void and an injunction against further collection and credit reporting, is appropriate respecting the Classes as a whole. Plaintiffs and the putative class seek an injunction prohibiting the Defendants from continued collection of these illegal loans; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

**COUNT I**
**VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.**
**(Against Tan Oak, Coho, Vela, and Epic,**
**on behalf of Plaintiffs and the FCCPA Class)**

229. Plaintiffs adopt and incorporate paragraphs 1 - 228 as if fully set forth at length herein.

Page **60** of **73**

230. Tan Oak and Coho violated § 559.72(9), Fla. Stat., when they attempted to collect — and did collect — the loans made to Ms. Nixon, Ms. McGuire-Brown, and the FCCPA Class, therein asserting the legal right to collect such Loans.

231. The loans issued through Tan Oak and Path Lending to Plaintiffs and the FCCPA Class were illegitimate and unenforceable due to the application of interest rates far in excess of 25% annually, in violation of § 687.071, Fla. Stat., and these Defendants knew, or should have known, the Loans were void and unenforceable in Florida.

232. Defendants' actions were willful, intentional, and done for the express purpose of collecting unenforceable debts and profiting therefrom; indeed, the same principals continued originating and collecting such loans through the Tan Oak brand *after* settling claims that the identical Path Lending scheme was unlawful.

233. Vela and Epic violated § 559.72(9), Fla. Stat., through the Epic platform and the "Epic Software" messaging program operating on SMS short code 63591, by composing and transmitting collection messages asserting the legal right to collect the void loans — including the September 20 and October 24, 2024 messages soliciting payment from Ms. McGuire-Brown — and, on information

and belief, transmitted similar collection messaging concerning loans from Tan Oak Lending through the same channel.

234.    Vela and Epic knew, or should have known, that the debts they attempted to collect were void and unenforceable. Epic performed the underwriting and decisioning for both brands at origination, its name appeared on the origination credit inquiries, it knew each borrower's state of residence and each loan's interest rate, and it had configured the very "lending models" and "repayment terms" whose proceeds the messages sought to collect.

**WHEREFORE,** Plaintiffs, individually and on behalf of the FCCPA Class, respectfully request this Honorable Court enter judgment against Tan Oak, Coho, Vela, and Epic, jointly and severally, ordering:

a.      Certification of the FCCPA Class pursuant to Fed. R. Civ. P. 23, with Plaintiffs as Class Representatives and their counsel as Class Counsel;

b.      Statutory damages of $1,000 for each Plaintiff, and aggregate statutory damages for the Class in the amount permitted by § 559.77(2), Fla. Stat.;

c.      Actual damages pursuant to § 559.77(2), Fla. Stat.;

d.      Injunctive relief prohibiting further collection of, and credit reporting concerning, the void loans, pursuant to § 559.77(2), Fla. Stat.;

e.      Reasonable costs and attorneys' fees pursuant to § 559.77(2), Fla. Stat.;

and,

f.      Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
**(Against All Defendants, on behalf of Plaintiffs
and the Nationwide Usury Class)**

235.    Plaintiffs adopt and incorporate paragraphs 1 - 228 as if fully set forth at length herein.

236.    The Defendants, through their participation in the Path Lending and Tan Oak Lending scheme, along with the Tribe and other persons, natural and otherwise, constitute an *enterprise* as defined by 18 U.S.C. § 1961(4).

237.    The Loans made to Plaintiffs and the Nationwide Usury Class charged interest rates more than twice the rate enforceable under the usury laws of each Class member's state of residence, and thus constitute *unlawful debt* pursuant to 18 U.S.C. § 1961(6).

238.    Each Defendant is a *person* within the meaning of 18 U.S.C. § 1961(3), distinct from the enterprise, who conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the collection of unlawful debt, in violation of 18 U.S.C. § 1962(c), causing Plaintiffs and the Nationwide Usury Class to repay amounts on the unlawful Loans.

239. Specifically, and as detailed in the allegations incorporated above: Tan Oak and Coho made and collected the unlawful Loans in their respective names; Milks built and controlled the corporate, domain, and technology infrastructure through which the loans were made and collected; Sanchez directed the funding, collection, and distribution of the loan proceeds; Sullivan operated the servicing, licensing, and consumer-reporting apparatus; Eisman maintained the books and accounted for the proceeds; Duncan administered and authorized the licensing scheme through which the Loans were made; Vela and Epic performed the underwriting, servicing, and collection technology functions; and the Unknown Entities funded the Loans, managed the operation, and collected the accounts.

240. Path Lending and Tan Oak Lending operated across state lines, making loans to consumers throughout the United States. As such, the Defendants' conduct involved interstate commerce.

**WHEREFORE,** Plaintiffs, individually and on behalf of the Nationwide Usury Class, respectfully request this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a. Certification of the Nationwide Usury Class pursuant to Fed. R. Civ. P. 23, with Plaintiffs as Class Representatives and their counsel as Class Counsel;

b.    Threefold the amount of actual damages, pursuant to 18 U.S.C. § 1964(c);

c.    A declaration that the Loans are void and unenforceable, and an injunction against their further collection;

d.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and,

e.    Any other relief this Court deems equitable and proper under the circumstances.

### COUNT III
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants, on behalf of Plaintiffs
### and the Nationwide Usury Class)

241.    Plaintiffs adopt and incorporate paragraphs 1 - 228 as if fully set forth at length herein.

242.    The Defendants violated 18 U.S.C. § 1962(d) by conspiring with each other, and with other entities and individuals, to violate 18 U.S.C. § 1962(c) through the issuance and collection of unlawful debts through the Tan Oak and Path Lending enterprise.

243.    The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of the conspiracy, including: (a) issuing the Loans; (b) funding the Loans; (c) requesting, selling, and obtaining consumer credit reports to underwrite the Loans; (d) initiating ACH deposits and withdrawals to

and from borrowers' bank accounts; (e) collecting Loan payments and usurious interest, including by SMS and e-mail; (f) furnishing Loan tradelines to Clarity; and, (g) providing the loan-management software through which the foregoing was accomplished.

244. Each Defendant's agreement is evidenced by, among other things: the sustained performance of that Defendant's designated role, described above, across successive lending brands; the maintenance of identical officer positions at parallel tribal and non-tribal entities; the continuation of originations and collections through the Tan Oak brand after the identical Path Lending scheme was sued and settled; and the receipt of compensation derived from the collection of unlawful debt.

245. The Defendants each knew the ultimate goal of the enterprise – to make and collect loans charging double the rate enforceable under the usury laws of each Class member's state.

**WHEREFORE,** Plaintiffs, individually and on behalf of the Nationwide Usury Class, respectfully request this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages, pursuant to 18 U.S.C. § 1964(c);

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and,

c.    Any other relief this Court deems equitable and proper under the circumstances.

**COUNT IV**
**<u>VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.</u>**
**(Against All Defendants, on behalf of Plaintiffs and the Florida Usury Class)**

246.    Plaintiffs adopt and incorporate paragraphs 1 - 228 as if fully set forth at length herein.

247.    The Defendants, through their participation in the Path Lending and Tan Oak Lending scheme, along with the Tribe and other persons, constitute an *enterprise* under § 772.102(3), Fla. Stat.

248.    The Loans charged interest rates far in excess of the maximum rate permitted by § 687.071(3), Fla. Stat., and were thus *unlawful debts* pursuant to § 772.102(2)(a)3., Fla. Stat.

249.    Violations of Chapter 687, Fla. Stat., constitute *criminal activity* as defined in § 772.102(1)(a), Fla. Stat.

250.    The Defendants each associated with the enterprise and participated, directly or indirectly, in the enterprise through the collection of unlawful debt and a pattern of criminal activity, in violation of § 772.103(3), Fla. Stat., causing Plaintiffs and the Class to repay amounts on the unlawful Loans.

Page **67** of **73**

**WHEREFORE,** Plaintiffs, individually and on behalf of the Florida Usury Class, respectfully request this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a. Threefold the amount of actual damages or, in the alternative, the statutory minimum of $200 per Class member, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b. Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c. Any other relief this Court deems equitable and proper under the circumstances.

**COUNT V**
**VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.**
**(Against All Defendants, on behalf of Plaintiffs and the Florida Usury Class)**

251. Plaintiffs adopt and incorporate paragraphs 1 - 228 as if fully set forth at length herein.

252. The Defendants violated § 772.103(4), Fla. Stat., by conspiring and endeavoring to violate § 772.103(3), Fla. Stat., through the issuance and collection of unlawful debts through the Tan Oak and Path Lending enterprise, as described herein.

253.    The Defendants each agreed to participate in the conspiracy and agreed to its overall objective — the making and collection of unlawful loans through the Tan Oak and Path Lending brands.

**WHEREFORE,** Plaintiffs, individually and on behalf of the Florida Usury Class, respectfully request this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages or, in the alternative, the statutory minimum of $200 per Class member, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.    Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.    Any other relief this Court deems equitable and proper under the circumstances.

### COUNT VI
### VIOLATIONS OF THE EFTA, 15 U.S.C. § 1693k(1)
### (Against Tan Oak, on behalf of Ms. Nixon and the EFTA Class)

254.    Plaintiffs adopt and incorporate paragraphs 1 - 228 as if fully set forth at length herein.

255.    Tan Oak, directly and through one or more of the Unknown Entities, violated 15 U.S.C. § 1693k(1), either willfully and intentionally, or recklessly and without regard for consumers' rights, by conditioning the extension of credit to

Ms. Nixon and the EFTA Class upon repayment by means of preauthorized electronic fund transfers, through the imposition of a $125 "origination fee" waived only for borrowers executing the ACH Authorizations.

**WHEREFORE,** Ms. Nixon, individually and on behalf of the EFTA Class, respectfully requests this Honorable Court enter judgment against Tan Oak, ordering:

a.     Certification of the EFTA Class pursuant to Fed. R. Civ. P. 23, with Ms. Nixon as Class Representative and her counsel as Class Counsel;

b.     Actual damages pursuant to 15 U.S.C. § 1693m(a)(1), including all sums debited pursuant to the unlawfully conditioned authorizations;

c.     Statutory damages of $1,000 for Ms. Nixon pursuant to 15 U.S.C. § 1693m(a)(2)(A), and aggregate statutory damages for the Class pursuant to 15 U.S.C. § 1693m(a)(2)(B);

d.     Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1693m(a)(3); and,

e.     Such other relief that this Court deems just and proper.

## COUNT VII
### DECLARATORY AND INJUNCTIVE RELIEF
**(Against Duncan, in his official capacity,
on behalf of Plaintiffs and all Classes)**

256.    Plaintiffs adopt and incorporate paragraphs 1 - 228 as if fully set forth at length herein.

257.    Duncan, as Chairperson of the Tribe and of the Tribal Council which directs and controls the TLRA and each licensed Lender, is the tribal officer responsible for the continued administration of the licensing scheme through which void, criminally usurious loans were made to, and continue to be collected from, Plaintiffs and the Classes.

258.    The making and collection of such loans, and the licensing machinery that authorizes them, constitute ongoing violations of Florida law, including §§ 687.071 and 516.02, Fla. Stat., the usury laws of the other states in which Nationwide Usury Class members reside, and federal law.

**WHEREFORE,** Plaintiffs, individually and on behalf of the Classes, respectfully request this Honorable Court enter judgment against Duncan, in his official capacity, ordering:

a.    A declaration that the loans made to Plaintiffs and the Class members are void *ab initio* and uncollectible;

b.    An injunction prohibiting the collection, attempted collection, or receipt of any payment on such loans;

c.    An injunction prohibiting the sale, assignment, or transfer of such loans or accounts;

d.    An injunction prohibiting the furnishing of derogatory credit information concerning such loans, and requiring requests for deletion of previously furnished tradelines;

e.    An injunction prohibiting the issuance or renewal of any tribal lending license authorizing consumer lending to Florida residents, or to residents of any other state in which Nationwide Usury Class members reside, at rates exceeding those permitted by the respective state's usury laws; and,

f.    Such other prospective relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

Respectfully submitted this June 17, 2026, by:

SERAPH LEGAL, P. A.

/s/ *Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar Number: 1015954
BMorgan@SeraphLegal.com
Thomas M. Bonan, Esq.
Florida Bar Number: 118103
TBonan@SeraphLegal.com
3505 E. Frontage Rd., Suite 145
Tampa, FL 33607
Tel: 813-567-3434
Fax: 855-500-0705
*Counsel for Plaintiffs*
*and the Putative Classes*

**ATTACHED EXHIBIT LIST**

A       Ms. Nixon's Loan Agreement with Tan Oak Lending, June 18, 2025 –
        Excerpt
B       Ms. McGuire-Brown's Loan Agreement with Path Lending, November 14,
        2023 – Excerpt